DECISION AND JOURNAL ENTRY
Appellant Dean Freeland has appealed from an order of the Summit County Common Pleas Court, Juvenile Division, that terminated his parental rights and awarded permanent custody of his children, Elvis, Tasha, Thomas, and Joseph Freeland, to the Summit County Children Services Board (CSB). This Court affirms.
 I.
Appellant is the father of Elvis, Tasha, Thomas, and Joseph.[1] On January 27, 1999, CSB filed a motion for emergency temporary custody of the children, which the juvenile court granted. The children were adjudicated neglected on March 31, 1999, and placed in temporary custody of CSB. On September 9, 1999, CSB filed a motion for permanent custody of the children. Appellant filed a motion for an in camera interview with the children, a motion to appoint counsel for the children because of a conflict of interest with the attorney guardian ad litem, and a motion for a six month extension of CSB's temporary custody. At the hearing, the juvenile court denied Appellant's requests. On January 27, 2000, the juvenile court terminated Appellant's rights and awarded CSB permanent custody of the children. Appellant timely appealed, asserting three assignments of error.
 II. A. Assignment of Error Number One The trial court erred in denying Appellant's motion for appointment of counsel for the children as a conflict in interest existed between the dual duties of the attorney/guardian ad litem as set forth in R.C. 2151.281(H) and Juv.R. 4(B)(2).
 In his first assignment of error, Appellant has asserted that Ms. Hoover's role as guardian ad litem was in direct conflict with her duty as an attorney to zealously represent the interest of the children. Appellant has argued that the trial court erred in not recognizing this conflict and appointing a new guardian ad litem. This Court disagrees.
R.C. 2151.281(H) provides that:
 If the guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child is an attorney admitted to the practice of law in this state, the guardian ad litem also may serve as counsel to the ward. If a person is serving as guardian ad litem and counsel for a child and either that person or the court finds that a conflict may exist between the person's roles as guardian ad litem and as counsel, the court shall relieve the person of duties as guardian ad litem and appoint someone else as guardian ad litem for the child. If the court appoints a person who is not an attorney admitted to the practice of law in this state to be a guardian ad litem, the court also may appoint an attorney admitted to the practice of law in this state to serve as counsel for the guardian ad litem.
 The Ohio Supreme Court has held that the role of a guardian ad litem is different than the role of an attorney. In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 232. The role of a guardian ad litem is to investigate the child's situation and then ask the juvenile court to do what is in the child's best interest, while the role of an attorney is to zealously represent his client within the bounds of law. Id. "If a person is serving as guardian ad litem and as attorney for a ward and either that person or the court finds a conflict between the responsibilities of the role of attorney and that of guardian ad litem, the court shall appoint another person as guardian ad litem for the ward." Juv.R. 4(C)(2).
The decision of whether there is a conflict of interest in the role of an attorney and guardian ad litem is within the discretion of the juvenile court. See, e.g., In re Keller (Sept. 30, 1998), Ashtabula App. Nos. 97-A-0071, 97-A-0072, unreported, 1998 Ohio App. LEXIS 4629, at *20-21. Absent an abuse of discretion, a reviewing court will not overturn a juvenile court's ruling. In re Peieper Children (1993), 85 Ohio App.3d 318, 330. An abuse of discretion is arbitrary, unreasonable, or unconscionable. State ex rel. The V Cos. v. Marshall (1998),81 Ohio St.3d 467, 469.
In the case at bar, the juvenile court questioned Ms. Hoover about her role as attorney and guardian ad litem to determine whether a conflict existed. Ms. Hoover stated that she did not feel there was a conflict. After the examination, the juvenile court found that there was no conflict of interest and denied Appellant's request to appoint a new attorney.
At the hearing, Ms. Hoover cross-examined the witnesses and reported her findings. Dr. Buk-Bjerre stated in his cross-examination, that when the children mentioned going home they focused on their room and personal items. Ms. Hoover, on the other hand, testified that Elvis mentioned that he wanted to be with his father, but not his mother. Ms. Hoover also gave her opinion that returning the children to Appellant was not in the best interest of the children. In light of the foregoing, this Court concludes that the juvenile court's decision was not an abuse of discretion. Appellant's first assignment of error is overruled.
 B. Assignment of Error Number Two The trial court erred when it denied Appellant's motion for a six-month extension of temporary custody.
 Assignment of Error Number Three The trial court erred in its discretion to award permanent custody of the children to [CSB] as such decision was against the manifest weight of the evidence.
 Because Appellant's second and third assignments of errors are interrelated, this Court will address them together. In his second assignment of error, Appellant has asserted that the juvenile court erred when it denied his request for a six-month extension of temporary custody. Specifically, Appellant has argued that he had made progress in his case plan, and could have completed it if the juvenile court had granted his request. In his third assignment of error, Appellant has asserted that the juvenile court's judgment was against the manifest weight of the evidence. This Court disagrees.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175; see, also State v. Otten (1986), 33 Ohio App.3d 339, 340. Accordingly, before an appellate court will reverse a judgment as against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
Termination of parental rights is an alternative of last resort; however, it is sanctioned when necessary for the welfare of a child. In re Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is neither abandoned nor orphaned, it must find by clear and convincing evidence that the grant of permanent custody to the agency is in the best interest of the child and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. See R.C. 2151.414(B)(1); see also, Inre William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will produce in the trier of fact "a firm belief or conviction as to the facts sought to be established."In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
Pursuant to R.C.2151.415(D)(1) a juvenile court:
 * * * may extend the temporary custody order of the child for a period of up to six months, if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.
 When determining whether a grant of permanent custody is in the best interest of the child, the juvenile court should:
 [C]onsider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 R.C. 2151.414(D)(1) through (5). When determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the juvenile court must find by clear and convincing evidence that at least one the sixteen factors enumerated in R.C. 2151.414(E) exist as to each of the child's parents. See In re William S., 75 Ohio St.3d at 99. Those factors are:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties[;]
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time * * *[;]
 (3) The parent committed any abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 (6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11
of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 (7) The parent has been convicted of or pleaded guilty to one of the following:
 (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (c) An offense under division (B)(2) of section 2919.22
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
 (11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
 The juvenile court should consider all relevant evidence when making such a determination. R.C. 2151.414(E).
At the hearing in this matter, CSB presented testimony establishing that it first became involved with the Freeland family in 1993. Apparently, the house where the children were residing with Appellant had no heat, plumbing, and water. During 1994, the house had caught on fire on two separate occasions. As a result of both fires, CSB received a referral for neglect. During April of 1997, Appellant was charged with domestic violence. From April 25, 1997 to January 28, 1998, the children were removed and placed in the custody of CSB.
Although CSB terminated its relationship with the family in March of 1998, CSB became involved again in November of 1998 when it learned of allegations of substance abuse, neglect, and domestic violence in the Freeland household. With no improvements in the Freeland household, CSB filed a motion for emergency custody on January 27, 1999. The children were adjudicated neglected on March 31, 1999, and placed in the temporary custody of CSB.
CSB prepared a case plan for Appellant with four objectives: (1) demonstrate and maintain an alcohol and drug free life-style; (2) demonstrate and maintain mental health and emotional stability; (3) demonstrate an ability to provide age-appropriate care and supervision for his children; and (4) demonstrate, learn, and apply age-appropriate behaviors, interactions, expectations, discipline, and nutrition for his children. This plan was amended on May 3, 1999 to include that Appellant was to undergo a clinical evaluation and chemical dependency assessment and follow all recommendations.
Todd Kutzera, a caseworker for CSB, testified at the hearing that Appellant was to submit weekly urine screens as part of the plan. From March to October of 1999, Appellant had only submitted nine urine screens, which were all negative. Mr. Kutzera stated that Appellant attended and participated in a substance abuse assessment with the Community Drug Board (CDB) on May 13, 1999. CDB's evaluation indicated that Appellant has a serious problem with alcohol and had a past history of treatment failure. After Appellant completed his assessment, he began individual and group counseling. Although Appellant completed stage II of his assessment he did not follow through with all of CDB's recommendations. There was no evidence that Appellant attended any Alcoholic Anonymous meetings, which were also part of CDB's recommendations. His last contact with CDB was August 25, 1999.
With regard to the objective to maintain his mental health and emotional stability, Mr. Kutzera testified that Appellant completed the assessment at Portage Path. From this assessment, Appellant was diagnosed with alcohol abuse and adjustment disorder with depression. Mr. Kutzera stated that although Appellant began attending individual therapy sessions, he stopped showing up after two sessions. Appellant testified at the hearing that he stopped attending the sessions because he did not think the counseling was helping him.
With regard to the requirement to provide age-appropriate care and supervision for the children, Mr. Kutzera testified that Appellant's house was not a safe and stable environment. He stated that the second fire in 1994 had caused substantial damage to the home. When he had visited the house one week before the hearing, there was still only drywall in the rooms. The home had no carpeting, stove, refrigerator, plumbing, electricity, water, or heat.
In response, Appellant admitted that he had recently repaired the house. He admitted that, for the past nine months, he had cashed the children's social security checks to pay for some of the building expenses.[2] Appellant also stated that he had borrowed money from his stepfather so that he could finish repairing the house. He testified that the utilities worked and submitted photographs that showed there were walls in all the rooms. He also pointed out that the kitchen contained new cabinets, the bathroom was completely remodeled and operational, and that the children's rooms were finished. When questioned about the stove and refrigerator, Appellant stated that he had locked them in the garage.
Concerning Appellant's fourth objective, Appellant admitted that he had not been employed for the past six months. He added that he could go back to his recent job as a mechanic, but did not substantiate it. Appellant stated that if he retained his job as a mechanic, a relative, friend, or the children's mother could watch the children while he worked.
Throughout the hearing, the children were described as wild, unruly, out of control and impulsive. Currently, the children are placed in four separate foster homes. Dr. Vera Buk-Bjerre, a psychologist from Akron Child Guidance, testified that Elvis was diagnosed with major depression. She suggested that Elvis needed a stable home with more supervision than the average child. Elvis was presently residing with his paternal aunt and grandfather and receives medication to cope with his depression. Elvis was also experiencing problems at school because of his depression.
Dr. Buk-Bjerre reported that Tasha suffered from post-traumatic stress disorder and adjustment disorder. At the time of the hearing, Tasha was just starting to talk about the fact that a cousin sexually molested her. Dr. Buk-Bjerre also reported that Tasha maintained a negative attitude towards her homework because she considered it pointless.
Dr. Buk-Bjerre diagnosed Thomas and Joseph with Attention Deficit Disorder (ADHD). She also reported that Thomas was very angry and destructive. She stated that Thomas once told her that he killed a cat and dog out of anger. Thomas had to be removed from a foster home after he jumped off the second floor and lunged at one of the foster family's daughter. Since his stay in foster care, Dr. Buk-Bjerre testified that Thomas seemed to be doing well and was attached to his foster mother. With regard to Joseph, the youngest child, Dr. Buk-Bjerre stated that he only needed medication for his ADHD and did not need further counseling at the time. Lastly, Dr. Buk-Bjerre gave her professional opinion that it would not be in the children's best interests to be returned to Appellant.
Vickie Diamond, a case aide from CSB, also testified concerning Appellant's interactions with his children during the scheduled visitations. She stated that Appellant attended every visitation. In her opinion, the children never had a problem separating from Appellant when the visitation concluded. She further stated that Appellant only interacted and played with the children when the mother visited. If the mother was absent, Appellant would sit and talk to another family member that always came with him. Ms. Diamond recalled one occasion where the children were yelling and fighting with each other, and she asked them why they were misbehaving. Tasha replied, "[w]ell, maybe it's because my mom isn't here and wasn't here last week." After Appellant responded, "I'm here[,]" the children stated, "well, we miss Mom."
Ms. Hoover, the attorney/guardian ad litem, testified that she was newly appointed and only observed the children with Appellant once. She withdrew her request for a six-month extension because she did not think Appellant would successfully complete his case plan. She stated that the children were very combative because they have lived in a home where there was domestic violence. In her opinion, she felt that the children mimicked their parents in their various interactions. She testified that, although the children stated that they wanted to go home, she felt that if the children returned to Appellant, any positive aspects of their counseling would be destroyed. Ms. Hoover added that she thought Appellant would disregard treatment for the children because during 1997 he did not continue their treatment when the children were returned to him.
Appellant testified that he stopped the counseling for his children because he wanted CSB out of his life. He felt that he could finish his case plan in six months. Appellant testified that he was planning on divorcing the mother of the children; however, he will always love her and will allow her to visit the children.
As a result of the evidence presented at the hearing, the juvenile court determined that the children could not be returned to Appellant within a reasonable time or should not be returned because he has failed to remedy the conditions that caused the removal of his children. Additionally, the juvenile court found that Appellant did not utilize the resources that were made available to him and demonstrated a lack of commitment towards the children by failing to comply with his case plan. Based on the foregoing, the juvenile court determined that the grant of permanent custody to CSB was in the children's best interest.
After reviewing the evidence, this Court cannot conclude that the juvenile court abused its discretion in denying Appellant's motion for a six-month extension of temporary custody. Further, this Court concludes that the juvenile court's finding that a grant of permanent custody to CSB was in the children's best interest was not against the manifest weight of the evidence. Accordingly Appellant's second and third assignments of errors are overruled.
 III.
Appellant's assignments of error are overruled. The judgment of the juvenile court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
___________________________ BETH WHITMORE
[1] Lorrie Freeland, the mother of the four children, has filed a separate appeal, which is still pending.
[2] The record indicated that each month social security would send Appellant $1,000 so that he could purchase medication for Joseph and Thomas. Although CSB had custody of the children, Appellant continued to cash the checks for the children.